## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DAVID VECCHIONE, on behalf of himself and all others similarly situated, | |
| | Civil Action No. |
| *Plaintiff*, | |
| | |
| v. | **CLASS ACTION COMPLAINT** |
| | |
| DEUTSCHE BANK SECURITIES INC., DEUTSCHE BANK AG, and JOHN DOES 1-50, | **JURY TRIAL DEMANDED** |
| | |
| *Defendants*. | |

Plaintiff David Vecchione, on behalf of himself and all others similarly situated, files this Complaint against Defendants Deutsche Bank Securities Inc., Deutsche Bank AG, and John Does 1-50 (collectively, "Deutsche Bank" or "Defendants") for violations of the Commodity Exchange Act. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.  NATURE OF THE ACTION

1.  This case is brought under the Commodities Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq*., for losses suffered when Plaintiff and the Class purchased and/or sold Eurodollar futures contracts ("Eurodollar Futures") or options on Eurodollar Futures contracts on domestic exchanges at artificial prices that were the result of spoofing and market manipulation by Deutsche Bank.

2.  The central theory of this case is straightforward. In 2013, unbeknownst to Plaintiff and the Class, Deutsche Bank used an illegal trading strategy called "spoofing"—entering orders to buy or sell Eurodollar Futures though it never intended to execute those orders—to fool everyone else and create an artificial appearance of market demand and artificial prices.

3.  Spoofing, which Congress criminalized in 2010 as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, is the illegal trading strategy where a trader creates artificial supply and demand by placing large and small orders on opposite sides of the market. Spoofing seeks to increase the available profits associated with high frequency trading by artificially altering the price of a given future via entering buy or sell orders that the trader has no intention of fulfilling. This action induces other trades to react in response, creating a small window in the market that the trader can use to reap an excessive profit.

4.  The Commodity Futures Trading Commission ("CFTC"), which has long regulated and sought to punish similar conduct under other provisions of the CEA, defines spoofing as "bidding or offering with the intent to cancel the bid or offer before execution," including

"submitting or canceling bids or offers with intent to create artificial price movements upwards or downwards."[1]

5.    The unlawful conduct and manipulation described herein is the subject of a CFTC Order[2] released on June 18, 2020.  Deutsche Bank "consent[ed] to the use of the findings of fact and conclusions of law[,]" was fined $1.25 million, and agreed to cease and desist from spoofing.[3]

6.    The CFTC Order detailed how "Trader B" of Deutsche Bank manipulated the Eurodollar Futures (and Treasury Futures) market by placing and canceling larger bids or offers it never intended to execute (the "Spoof Order")—that were often twenty times larger than the smaller bid or offer at or near the best price (the "Genuine Order")—on the opposite side of the same market.

7.    "Trader A" of Deutsche Bank also spoofed and manipulated Treasury Futures during the Class Period by placing and canceling Spoof Orders on opposite sides of the same market.

8.    Caught in the middle of the unlawful Spoof Orders are market participants induced by the artificial appearance of market demand and artificial prices to enter sell orders below, or buy orders above, what would otherwise have been the prevailing market price and quantity.

9.    This is not the first time Deutsche Bank has used spoofing to manipulate futures prices.  On June 2, 2017, Deutsche Bank trader David Liew pled guilty to wire fraud and other charges brought by the U.S. Department of Justice ("DOJ") detailing a scheme "in trading,

---

[1] CFTC, Interpretive Guidance and Policy Statement on Disruptive Practices, available at: https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/dtp_factsheet.pdf (last accessed July 20, 2020).

[2] *In re Deutsche Bank Sec. Inc.*, CFTC Docket No. 20-17 (June 18, 2020) (hereinafter "CFTC Order").

[3] *Id*. at 5-6.

practice, and conduct, on and subject to the rules of the Chicago Mercantile Exchange ("CME"), that was, was of the character of, and was commonly known to the trade as, spoofing, that is, bidding or offering with the intent to cancel the bid or offer before execution, by causing to be transmitted to the CME precious metals futures contract orders that Liew and his co-conspirators intended to cancel before execution and not as part of any legitimate, good-faith attempt to execute any part of the orders . . . ."[4]

10.     On January 29, 2018, the CFTC fined Defendants $30 million for spoofing the precious metals futures market.[5]

11.     Likewise, on July 25, 2018, DOJ criminally charged two of Deutsche Bank's employees, James Vorley and Cedric Chanu, with conspiracy and wire fraud charges related to "a years-long conspiracy to defraud other traders on the Commodity Exchange Inc … by placing fraudulent orders that they did not intend to execute in order to create the appearance of false supply and demand and to induce other traders to trade at prices, quantifies and times that they otherwise would not have traded."[6]

12.     Although it has been publicly disclosed that Deutsche Bank agreed to pay a penalty to settle claims related to spoofing Eurodollar Futures and Treasury Futures, most details of their conduct remain hidden from view. Deutsche Bank's illegal practices occurred on futures markets, where participants' activities are shielded by anonymity in order to protect proprietary trading

---

[4] *USA v. Liew*, No. 17-CR-001, Plea Agreement (N.D. Ill. June 1, 2017), available at: https://www.justice.gov/criminal-fraud/file/972986/download (last accessed July 20, 2020).

[5] *See In re Deutsche Bank AG and Deutsche Bank Sec. Inc.*, CFTC No. 18-06 (Jan. 29, 2018).

[6] DOJ Press Release (July 25, 2018), *Two Former Deutsche Bank Traders Charged With Deceptive and Manipulative Trading Practices in U.S. Commodities Market* [Press Release], available at: https://www.justice.gov/opa/pr/two-former-deutsche-bank-traders-charged-deceptive-andmanipulative-trading-practices-us (last accessed July 20, 2020).

strategies. Deutsche Bank also was aware that their conduct was illegal and if exposed would subject them to serious penalties. Accordingly, Deutsche Bank's misconduct was concealed. Discovery is likely to yield additional facts to support Plaintiff's allegations.

13.     Deutsche Bank's conduct caused actual damages to Plaintiff and members of the Class in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*  Plaintiff seeks damages caused by Defendants' illegal spoofing and Defendants' violations of the Commodity Exchange Act.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Commodity Exchange Act, 7 U.S.C. § 1.

15.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) and Section 22 of the CEA, 7 U.S.C. § 25(c).  A substantial part of Defendants' acts or omissions occurred in this District, for which Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the facilities of the national securities markets.  Further, the CME Group Inc.[7] headquartered at 20 South Wacker Drive, Chicago, Illinois 60606, operates the largest futures exchange in the world, and is where the alleged manipulation occurred.

16.     This Court has personal jurisdiction over each Defendant, because: each Defendant was found or resided in this District, had agents in this District, or transacted business throughout the United States, including this District; a substantial part of the events giving rise to Plaintiff's

_____

[7] On July 12, 2007, the Chicago Mercantile Exchange ("CME") merged with the Chicago Board of Trade ("CBOT")  to form CME Group Inc.

claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.     THE PARTIES

17.     Plaintiff David Vecchione was at all relevant times an Illinois resident.  Plaintiff Vecchione transacted in Eurodollar Futures during the Class Period, including purchases and sales of Eurodollar Futures on domestic exchanges.   These instruments were manipulated by Defendants' spoofing conduct, and Plaintiff Vecchione had transactions that were adversely impacted by this manipulation. As a direct and proximate result of the wrongdoing alleged herein, Plaintiff Vecchione was harmed as described below and suffered economic injury as a result.

18.     Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany. Defendant Deutsche Bank AG is licensed by the New York Department of Financial Services with a registered address at 60 Wall Street, New York, New York 10005-2858.

19.     Deutsche Bank Securities Inc. is a Delaware corporation with principal place of business in New York, New York. Deutsche Bank Securities Inc. is an indirect wholly-owned subsidiary of Deutsche Bank AG and is registered as a broker-dealer with the SEC and as a futures commission merchant with the CFTC. Deutsche Bank Securities Inc. is a clearing member of the CME.

20.     Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. are referenced collectively in this Complaint as "Deutsche Bank."

21.     Defendants John Doe 1-50 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly inappropriately influenced or attempted to influence the trading and prices of Eurodollar Futures. The defined term "Defendants" also includes John Doe Defendants.

22.     During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the manipulation of Eurodollar Futures, at artificial prices not reflecting fundamental supply and demand, to Defendants' direct benefit. The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

23.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint. These actions were authorized, ordered, or undertaken by Defendants' various officers, agents, employees, or other representatives while engaged in the management of Defendants' affairs (or those of their predecessors-in-interest) within the course and scope of their duties and employment or with the actual, apparent, and/or ostensible authority of Defendants.

24.     Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## IV.     FACTUAL ALLEGATIONS

### A.     Overview of Eurodollar Futures

25.     Eurodollars are U.S. dollars held at commercial banks outside the U.S. banking system. These banks can be located anywhere in the world, including in foreign branches of U.S. based financial institutions.

26.     Eurodollar Futures and options on Eurodollar Futures—which are the subject of this Complaint—were launched by CME in 1981, marking the first cash-settled futures contract.

Most Eurodollar Futures trades take place on the CME. Eurodollar Futures are one of the largest and most successful interest rate-based contracts.[8]

27.     The underlying instrument in Eurodollar Futures is a eurodollar time deposit, having a principal value of $1 million with a three-month maturity. On expiration, the seller of cash-settled futures contracts can transfer the associated cash position rather than making a delivery of the underlying asset.

28.     The price of Eurodollar Futures reflects the interest rate offered on U.S. dollar-denominated deposits held in banks outside the U.S. It is quoted at 100 minus yield—so if the yield is 0.85%, the Eurodollar Future contract is quoted at 99.15 (100-0.85).[9]

29.     More specifically, the price reflects the market gauge of the 3-month U.S. dollar LIBOR (London Interbank Offered Rate) interest rate anticipated on the settlement date of the contract.[10] LIBOR is a benchmark for short-term interest rates at which banks can borrow funds in the London interbank market.

30.     Eurodollar Futures at CME Group are priced based on the 3-month LIBOR underlying rate and listed under the March quarterly cycle for 40 consecutive quarters, plus four serial contracts at the front end of the curve.[11]

31.     Eurodollars are financially settled products, and expire on the second business day that precedes the third Wednesday of each contract month, which is usually a Monday.[12]

---

[8] *See* CME Group, *Eurodollar Futures: The Basics* (Feb. 2019) available at: https://www.cmegroup.com/education/files/eurodollar-futures-the-basics-file01.pdf (last accessed July 20, 2020).

[9] *Id.*

[10] *Id*.

[11] *Id*.

[12] *See* https://www.cmegroup.com/education/courses/introduction-to-eurodollars/what-is-libor-what-is-eurodollar.html (last accessed July 20, 2020).

32.     Eurodollars have grown to be one of the leading contracts offered on the CME in terms of average daily volume and open interest (the total number of open contracts). The futures often surpass the E-Mini S&P 500 futures (an electronically traded futures contract one-fifth the size of the standard S&P 500 futures contract), crude oil futures, and 10-Year Treasury Note futures in terms of average daily trading volume and open interest.  Options on Eurodollar Futures averaged over 1.1 million contracts traded per day in 2019.

**B.      Eurodollar Futures on Domestic Exchanges**

33.     An investor trading future contracts can buy or sell a future or option contract on a domestic exchange like the CME. Futures contracts involve a promise—generally made through a futures exchange—to buy or sell a particular commodity or financial instrument, at a predetermined price, on a fixed date in the future (i.e., on an "expiry date").  Eurodollar Futures contracts are cash-settled, instead of requiring physical delivery of the underlying commodity or instrument on the expiry date.

34.     An option contract is an agreement that gives the buyer the right—but not the obligation—either to buy (in the case of a "call option") or to sell (in the case of a "put option") a particular commodity or financial instrument, at a predetermined price, at or during a specified time period in the future.  The agreed price is generally known as the "strike price."

35.     The main driver of whether an option is exercised is whether it is "in the money" or "out of the money."   An in-the-money option is one where the holder is entitled to a cash payment if she exercises the option.  For example, if an option holder has the right to buy a widget at a price of $100 (a call), and the market price for the widget is currently $400, the call option is in the money—because the option holder could make a $300 profit by buying a widget for $100 and immediately selling it for $400.

9

36. An out-of-the-money put or call is one where the option holder is not entitled to a cash payment if she exercises the option. For example, if an option holder has the right to sell a widget at a price of $100 (a put), and the market price for the widget is currently $400, the option is out of the money—because the opportunity to sell at $100 is worthless when the option holder could sell at $400 on the open market.

37. Investors in Eurodollar Futures or options can either buy (i.e., take a "long" position) or sell (i.e., take a "short" position). A long position means that the investor believes that prices will rise; they expect to be able to sell (i.e., settle or close their position) at a higher price in the future. A short position means that the investor believes that prices will decline; they expect to be able to buy (i.e., settle or close their position) at a lower price in the future.

38. CME Globex—a CME operated electronic trading platform that is used to trade futures and options contracts—utilizes an electronic "Order Book" that displays quantities of anonymous orders or offers to sell futures contracts and bids to buy futures contracts at various price points or "levels." An "order" is a request to buy (a "bid") or sell (an "offer" or "ask"). The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level. The best ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between these two prices.

39. Quotes to buy or sell are entered into the Order Book, which allows market participants to see the number of orders and the total number of contracts that all traders are actively bidding or offering at a given price level. Trading on these platforms is anonymous, and the identify of any trader behind a specific bid or ask is unknown to market participants. Thus, here for instance, market participants like Plaintiff could not tell if Defendants repeatedly placed and then cancelled orders on opposite sides of the market.

**C.     "Spoofing" to Manipulate Futures Market**

40.     Eurodollar Futures and options are very actively traded in a highly liquid market and trades are executed on electronic platforms. In addition, trading on these platforms is anonymous, and the identity of any trader behind a specific bid or ask is unknown to market participants. These characteristics make the market for Eurodollar Futures and options particularly susceptible to manipulation by an illegal practice known as "spoofing."

41.     Section 747 of the Dodd-Frank Wall Street Reform and Consumer Protection Act amended the CEA's "Prohibited Transactions" section.[13]  This statute, 7 U.S.C. § 6c(a)(5)(C), reads in pertinent part, that "it shall be unlawful for any person to engage in any trading, practice, or conduct on or subject to the rules of a registered entity that is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)."[14]

42.     In the wake of Dodd-Frank, CME adopted rules that specifically prohibit spoofing as a supplement to their pre-existing prohibitions on manipulative trading practices. The CME Group Exchanges' Rule 575 (which took effect in September of 2014) prohibits "Disruptive Practices" and provides in part: "All orders must be entered for the purpose of executing bona fide transactions. . . . No person shall enter or cause to be entered an order with the intent, at the time of order entry, to cancel the order before execution or to modify the order to avoid execution."[15]

---

[13] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, § 747, 124 Stat. 1376, 1739 (2010).

[14] 7 U.S.C. § 6c(a)(5)(C) (2012).

[15] *See also* CME Rules 432.B.2., 432.H., 432.Q., 432.T. (general prohibitions on dishonest and manipulative conduct, and conduct inconsistent with just and equitable principles of trade), available at: https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/4/4.pdf (last accessed July 20, 2020).

43.     Spoofing is used by traders to manipulate prices and it undermines the integrity of trading. The CFTC defines spoofing to include: (i) submitting or cancelling bids or offers to overload the quotations system of a registered entity, (ii) submitting or cancelling bids or offers to delay another person's execution of trades, (iii) submitting or cancelling multiple bids or offers to create an appearance of false market depth, or (iv) submitting or canceling bids or offers with the intent to create artificial price movements upwards or downwards.[16]

44.     Former CFTC director of enforcement Aitan Goelman has stated that "protecting the integrity and stability of the U.S. futures market is critical to ensuring a properly functioning financial system."[17]

45.     An example of how spoofing works is as follows:[18]

---

[16] CFTC Interpretive Guidance and Policy Statement on Disruptive Practices, available at: https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/dtp_factsheet.pdf (last accessed July 20, 2020).

[17] CFTC Press Release (May 5, 2015). *CFTC Charges United Arab Emirates Residents Heet Khara and Nasim Salim with Spoofing in the Gold and Silver Futures Market* [Press Release 7171-15], available at: https://www.cftc.gov/PressRoom/PressReleases/7171-15 (last accessed July 20, 2020).

[18] U.S. Congressional Research Service. High Frequency Trading: Overview of Recent Developments (R44443; Apr. 4, 2016), by Rena S. Miller and Gary Shorter. Available at: https://fas.org/sgp/crs/misc/R44443.pdf (last accessed July 20, 2020).



46.     Spoofing is generally understood to be a trading strategy in which a large order is placed on one side of the market and a small order is placed on the opposite side.  There is no intention to trade the larger order.  The intention is that the smaller order is traded and the larger order will be canceled.

47.     By flooding the market with trade orders that are never intended to be filled, a spoofer can create fake demand that pushes prices up or down, which tricks other market participants into buying or selling at artificial or manipulated prices. The spoofer can then scoop up the mispriced contracts and reap a profit by flipping them at the true market price.

48.     Traders engaged in spoofing gain an unfair and unlawful advantage over other market participants, hindering competition, undermining market integrity, and harming law-abiding victims.  And, as alleged here, Defendants' use of spoofing harmed Plaintiff and the Class members who purchased or sold Eurodollar Futures at artificial prices during the Class Period.

### D. Deutsche Bank's Spoofing Strategy

49.     During the Class Period, Deutsche Bank—one of the largest futures trading firms in the world—traded interest rate futures contracts, and options on futures contracts, including, but not limited to Eurodollar Futures.[19]

50.     Unbeknownst to Plaintiff and the Class, Eurodollar Futures were hijacked by Deutsche Bank so they could manipulate demand and pricing.  And this hijacking was occurring, consistently, impacting market participants. Thus, far from reflecting market volatility, Deutsche Bank fooled everyone else into accepting artificial prices.

51.     According to the CFTC, Deutsche Bank used spoofing to manipulate the U.S. Eurodollar Futures market by submitting and then quickly withdrawing orders they never intended to fill once it has served its purpose (here, creating the false appearance of demand to either buy or sell certain Eurodollar instruments). Specifically, Deutsche Bank placed smaller Genuine Orders (bids or offers at or near the best price) and Spoof Orders (a larger bid or offer on the opposite side of the same (or correlated) market it never intended to execute), thus creating an artificial appearance of market demand and artificial prices that in turn induced other market participants to act.[20]  Then within milliseconds, Deutsche Bank would fill its Genuine Order and cancel its Spoof Order.[21]

52.     This repeated, highly coordinated action by Deutsche Bank sent false pricing signals to market participants and led other traders to believe the value of a Eurodollar Futures had moved.

---

[19] *See* Deutsche Bank Securities Inc., *FCM Specific Disclosure Document* (Feb. 29, 2020), https://www.db.com/usa/docs/dbsi-fcm-specific-disclosure.pdf (last accessed July 20, 2020).

[20] CFTC Order, at 2-3 (June 18, 2020).

[21] *Id.*

53. A Deutsche Bank trader identified in the CFTC Order as "Trader B" traded during the overnight United States trading hours, frequently placing primary Eurodollar (and Treasury) Futures contracts at or near the best price while simultaneously also placing and canceling much larger orders—often twenty times larger than the Genuine Order—in the opposite direction of the market, or in correlated market for a different tenor of a Eurodollar Futures contract, or in one tenor of the Eurodollar pack or bundle,[22] in order to have the primary orders filled at favorable prices.[23]

54. The CFTC also charged that "Trader A" during the overnight United States trading hours, when volume and volatility were comparably low relative to daytime hours, would frequently place primary Treasury Futures contracts at or near the best price while simultaneously also placing and canceling much larger orders in the opposite direction of the market or in correlated markets, in order to have the primary orders filled at favorable prices.[24]

55. CFTC allege that the actions of Deutsche Bank violated Section 4c(a)(5)(C) of the CEA, 7 U.S.C. § 4c(a)(5)(C) (2018).[25] Deutsche Bank agreed to cease and desist these spoofing actions that violated Section 4c(a)(5)(C), and pay a civil monetary penalty in the amount of $1.25 million.[26]

---

[22] CFTC defines a Eurodollar pack or bundle as "an aggregation of multiple tenors of Eurodollar futures contracts in equal proportions traded simultaneously. They create or liquidate positions along a particular segment of the yield curve in a single transaction." *Id*. at 3, n.3.

[23] *Id*. at 3.

[24] *Id*.

[25] *Id*. at 1.

[26] *Id*. at 6.

**E.      Plaintiff and Members of the Class Were Harmed by Deutsche Bank's Spoofing**

56.      Defendants' spoofing deprived Plaintiff and members of the Class of a lawfully operating market during the Class Period.

57.      Plaintiff and members of the Class were harmed because they were transacting in products that were *not* the result of regular forces of supply and demand.  Rather, Plaintiff and members of the Class were tricked into trading Eurodollar Futures that were mispriced due to Defendants' spoofing conduct and the subsequent inflation or suppression of the price.

58.      As a result, Class members were forced to pay more for (or to accept less from) these instruments than they would have in a fair and orderly market.  The artificial forces that manipulated the affected instruments coincided with Plaintiff's investment decisions, causing Plaintiff concrete monetary harm.  As a result, Plaintiff and the Class suffered actual damages and harm.

**F.      Deutsche Bank's Pattern of Illegal Spoofing to Manipulate Futures Market**

59.      Over the last twelve years, Deutsche Bank has repeatedly engaged in trading practices that attracted criminal and regulatory charges. The CFTC Order penalizing Deutsche Bank for spoofing Eurodollar Futures noted that "[t]he Commission previously sanctioned Deutsche Bank for failure to supervise its traders in connection with spoofing on Deutsche Bank AG's metals desk from 2008 to 2014."[27]

60.      Furthermore, on June 2, 2017, Deutsche Bank trader David Liew pled guilty to wire fraud and other charges brought by DOJ detailing a scheme "in trading, practice, and conduct, on and subject to the rules of the Chicago Mercantile Exchange ("CME"), that was, was of the character of, and was commonly known to the trade as, spoofing, that is, bidding or offering with

---

[27] *Id*. at 3, n.4.

the intent to cancel the bid or offer before execution, by causing to be transmitted to the CME precious metals futures contract orders that Liew and his co-conspirators intended to cancel before execution and not as part of any legitimate, good-faith attempt to execute any part of the orders . . . ."[28]

61. On January 29, 2018, CFTC fined Defendants $30 million for spoofing precious metals futures.[29] According to the CFTC Order, "from at least February 2008 and continuing through at least September 2014, DB AG, by and through certain precious metals traders (Traders), engaged in a scheme to manipulate the price of precious metals futures contracts by utilizing a variety of manual spoofing techniques."[30] The CFTC also found that Deutsche Bank "intended to manipulate and, on occasion, succeeded in manipulating the prices of the precious metals futures contracts . . . and, on some occasions, did benefit from the artificial prices caused by the manipulation carried out by its Traders."[31]

62. Likewise, on July 25, 2018, DOJ criminally charged two of Deutsche Bank's employees, James Vorley and Cedric Chanu, with conspiracy and wire fraud charges related to "a years-long conspiracy to defraud other traders on the Commodity Exchange Inc."[32] Each were

---

[28] *USA v. Liew*, No. 17-CR-001, Plea Agreement (N.D. Ill. June 1, 2017), available at: https://www.justice.gov/criminal-fraud/file/972986/download (last accessed July 20, 2020).

[29] *See In re Deutsche Bank AG and Deutsche Bank Sec. Inc.*, CFTC No. 18-06 (Jan. 29, 2018).

[30] *Id*.

[31] *Id*.

[32] DOJ Press Release (July 25, 2018), *Two Former Deutsche Bank Traders Charged With Deceptive and Manipulative Trading Practices in U.S. Commodities Market* [Press Release], available at: https://www.justice.gov/opa/pr/two-former-deutsche-bank-traders-charged-deceptive-andmanipulative-trading-practices-us (last accessed July 20, 2020).

alleged to have manipulated previous metals futures markets from 2009 to 2011, individually, in coordination with one another, and with Liew.[33]

63.     The recent manipulation and spoofing findings have revealed that Deutsche Bank cultivated a trading culture and strategy rooted in market manipulation, including the systemic use of spoofing to bolster its profits at the expense of other market participants.

## V.     EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

64.     Defendants actively, fraudulently, and effectively concealed their unlawful conduct and manipulation of the Eurodollar Futures market.

65.     Within the time period of any applicable statutes of limitations, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Defendants were manipulating the Eurodollar Futures market.  Until recently, as a result of Defendants' hidden misconduct, affirmative misstatements and acts of concealment, Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were manipulating the Eurodollar Futures market.

66.     Plaintiff and the Class did not and could not know of Defendants' unlawful acts in the Eurodollar Futures market in 2013 before June 18, 2020, when the CFTC disclosed the consent order with Deutsche Bank.

67.     Defendants never disclosed that they placed "spoofed" orders to manipulate the prices of Eurodollar Futures. Indeed, the very purpose of Defendants' spoofing was the deception of Plaintiff and the Class; only by tricking counterparties into believing in the artificial demand created by their spoofed orders could Defendants complete their series of trades for a profit—which they did.

---

[33] *Id.*

68. Defendants' manipulation is also inherently self-concealing. Trades on electronic platforms are anonymous. Defendants engaged in manipulative activities that were carried out at least in part, through means and methods specifically designed to avoid public detection and which, until very recently, successfully eluded public detection. Therefore, Plaintiff and the Class could not have discovered Defendants' conduct prior to CFTC disclosing the consent order with Deutsche Bank.

69. For these reasons, all applicable statute of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, and/or Defendants' fraudulent concealment. Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## VI. CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action on behalf of himself and all others similarly situated as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons and entities who transacted in Eurodollar Futures or options on Eurodollar Futures that were traded on a United States exchange during the period January 1, 2013 to December 31, 2013 (the "Class Period").

71. The following persons and entities are excluded from the above-described proposed Class:

(a) Defendants, their co-conspirators, and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b) All governmental entities;

(c) All Counsel of Record; and

(d) The Court, Court personnel, and any member of their immediate families.

72.     Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds or thousands of members of the Class widely dispersed throughout the United States. Moreover, given the costs of complex litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

73.     Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct.

74.     Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.

75.     Plaintiff is represented by counsel with experience in the prosecution of class action litigation with experience in class action litigation involving CEA claims.

76.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

77.     Questions of law and fact common to the Class include:

(a)     Whether Defendants participated in the Eurodollar Futures market;

(b)     Whether Defendants' fixed, lowered, maintained, stabilized, or otherwise manipulated Eurodollar Futures prices;

(c)     The nature and duration of the Defendants' manipulation of the Eurodollar Futures market;

(d)      Whether Defendants' conduct violated the CEA;

(e)      Whether Defendants fraudulently concealed their misconduct from Plaintiff and other members of the Class;

(f)      Whether the conduct of Defendants, as alleged in this Complaint, caused damages to Plaintiff and other members of the Class; and

(g)      The appropriate measure of damages sustained by Plaintiff and other members of the Class.

78.      Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

79.      Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VII.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of 7 U.S.C. § 1, *et seq*. and Regulation 180.2**
**Manipulation in Violation of the Commodity Exchange Act**

80.      Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

81.      During the Class Period Defendants intended to and did cause artificial prices of Eurodollar Futures in violation of the CEA, 7 U.S.C. §1, *et seq.*, through the use of spoofing and other manipulative conduct.

82.     By spoofing the Eurodollar Futures market, Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of any registered entity in violation of the CEA.

83.     During the Class Period, Eurodollar Futures' prices did not result from the legitimate market information and the forces of supply and demand. Instead, Eurodollar Futures' prices were artificially manipulated by Defendants' spoofing conduct.

84.     Throughout the Class Period, Defendants entered large orders to buy or sell with no intention of filling them, instead planning to cancel those orders prior to execution. Defendants polluted the market with false information about supply and demand to manipulate prices up or down. As a result of this conduct, Plaintiff and the Class were damaged by losses on their Eurodollar Futures trades.

85.     Defendants' manipulative conduct of Eurodollar Futures' prices persisted throughout the Class Period and caused damages to Plaintiff and Class members who purchased or sold at the artificial prices.

86.     Defendants had the ability to cause, intended to cause and did cause artificial prices of Eurodollar Futures. Defendants were active in the markets for Eurodollar Futures throughout the Class Period and were aware of the effects of spoofing on the markets.

87.     By their intentional misconduct, each Defendant violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

88.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Eurodollar Futures to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

89.     Defendants' spoofing deprived the Class of a lawfully operating market during the Class Period.

90.     Plaintiff and the Class transacted at artificial and unlawful prices resulting from the Defendants' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq*., and Regulation 180.2, and as a direct result thereof were injured and suffered damages.  Plaintiff and the Class sustained and are entitled to actual damages for the violations of the CEA alleged therein.

## SECOND CLAIM FOR RELIEF
### Violation of 7 U.S.C. § 1, *et seq*. and Rule 180.1(a)
### Employment of Manipulative or Deceptive Device in Violation of the Commodity Exchange Act

91.     Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

92.     Defendants' spoofing conduct, including the use of submitting and cancelling orders and engaging in other manipulative conduct in order to artificially move prices for Eurodollar Futures, constitutes use of a manipulative and deceptive device.

93.     Defendants acted intentionally, or at least acted recklessly, in employing the manipulative and deceptive device. The ability of Defendants' spoof orders to mislead other market participants into believing there was genuine demand for purchasing or selling as represented by the Defendants' deceptive orders must have been known to Defendants.

94.     Defendants knew that their spoof orders would impact the trading decisions of other market participants; thus, Defendants were, at a minimum, reckless with respect to the danger that their spoof orders would mislead other market participants.

95.     Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

96.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Eurodollar Futures contracts and options on those Eurodollar Futures contracts to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

97.     Defendants' spoofing deprived the Class of a lawfully operating market during the Class Period.

98.     Plaintiff and the Class transacted at artificial and unlawful prices resulting from the Defendants' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq*., and Rule 180.1(a), and as a direct result thereof were injured and suffered damages.  Plaintiff and the Class sustained and are entitled to actual damages for the violations of the CEA alleged therein.

### THIRD CLAIM FOR RELIEF
**Violation of 7 U.S.C. § 1, *et seq*.**
**Vicarious Liability in Violation of the Commodity Exchange Act**

99.     Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

100.    Defendants are liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

101.    Defendants' spoofing deprived the Class of a lawfully operating market during the Class Period.

102.    Plaintiff and the Class transacted at artificial and unlawful prices resulting from the Defendants' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq*., and as a direct result thereof were injured and suffered damages.  Plaintiff and the Class sustained and are entitled to actual damages for the violations of the CEA alleged therein.

## VIII.   RELIEF REQUESTED

103.    Accordingly, Plaintiff, on behalf of himself and the proposed Class, respectfully requests:

(a)    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class counsel for the Class;

(b)    For a judgment awarding Plaintiff and the Class damages, as well as punitive or exemplary damages, against Defendants for their violations of the CEA, together with pre- and post-judgment interest at the maximum rate allowable by law;

(c)    For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(d)    For such other and further relief as the Court may deem just and proper.

## IX.   JURY DEMAND

104.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.

Date: July 22, 2020                     **FREED KANNER LONDON & MILLEN LLC**

By: /s/ Steven A. Kanner
Steven A. Kanner
Douglas A. Millen
Brian M. Hogan
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
Fax: (224) 632-4521
skanner@fklmlaw.com
dmillen@fklmlaw.com
bhogan@fklmlaw.com

*Counsel for Plaintiff David Vecchione and the Proposed Class*